CASE 11.—ACTION BY THE PREDESTINARIAN BAPTIST
        CHURCH AGAINST THE UNITED BAPTIST
        CHURCH.—June 17, 1910.

# Predestinarian Baptist Church v. United Baptist Church.

Appeal from Madison Circuit Court.

J. M. Benton, Circuit Judge.

From a judgment for defendant plaintiff appeals.
—Affirmed.

1.  Religious Societies—Actions—Laches.—A conveyance was
    made to trustees for the use of a church holding certain
    doctrines, and subsequently certain members left the congre-
    gation, claiming that there had been a departure from the
    true doctrines of the church, such persons establishing and
    maintaining a church organization. Nineteen years there-
    after the successors of those who left sued to recover the
    property; those who left the church and a large number of
    those who took part in the transaction being dead. Held, that
    the suit was barred by laches.
2.  Equity—Laches.—Although limitation is not pleaded, a court
    of equity will refuse to enforce a stale claim, especially
    where it is without merit in fact.

GRANT E. LILLY, SMITH & SMITH and J. N. CULTON for
appellant.

J. A. SULLIVAN, A. R. BURNAM and J. C. CHENAULT for ap-
pellee.

Opinion of the Court by Judge Hobson—Affirm-
ing.

On March 15, 1828, Green Clay and his wife exe-
cuted the following deed: "This indenture made and
entered into this 15th day of March, 1828, by and be-

tween Green Clay, and Sally, his wife, of the county of Madison and state of Kentucky, of the one part, and Thompson Burnam, Mauzey Q. Ashby and William McClannahan in trust for the only proper use and behoof of the Particular Baptist Church to be constituted in the town of Richmond, holding the doctrine of predestination, particular redemption, total depravity, effectual calling, the certain perseverance of the saints and believers in baptism by immersion, of the other part, witnesseth: That the said Green Clay and Sally, his wife, for divers good considerations to them hereunto moving and wishing to patronize and encourage said Church, have this day given and confirmed and do by these presents give and confirm unto the said Thompson Burnam, Mauzey Q. Ashby and William McClannahan in trust for the only proper use and behoof of the aforesaid Particular Baptist Church and its successors of the same faith and order, a certain lot of ground." (Here follows description of the property and a habendum stipulating that the church was to be built in two years and providing for a reversion of the property if it was converted to any other use.) A church was built within two years as provided by the deed, and the congregation continued to worship there for many years. The church during the War was used by the United States authorities as a hospital, and after the War the property was in bad repair. Under an agreement between the congregation of the Particular Baptist Church and the congregation of the Missionary Baptist Church, each raised the money necessary to build a new church, to be used by the two congregations, one of them using it on two Sundays in the month, and the other on the other two, each to maintain separate Sunday schools. The money was raised and the

church built, and in 1882 the Particular Baptist Church conveyed to the Missionary Baptist Church a half interest in the property. There being some doubt in the minds of the parties about the reversion, in 1886 a deed was obtained from the heirs of Green Clay by which they conveyed the reversion to the trustees of the Particular Baptist Church, these trustees having come down by regular succession from the original trustees named in the deed of 1828. In the year 1888, a trouble arose in the Particular Baptist Church, some of the members claiming that the pastor, Elder E. H. Burnam, was preaching doctrines not in conformity to the principles of the church. At a church meeting there was a controversy in October, 1888, and seven members of the church withdrew; the majority of the congregation siding with the pastor. One of the seven members was the clerk of the church who had charge of the church records. He declined to give them up to C. F. Burnam who was elected clerk. Three of the seven members asked letters of dismission, and these were given. The other four did not ask letters of dismission, and at a church meeting in November, 1888, the fellowship of the church was withdrawn from them. These four members, claiming that they were true to the faith of the church and in fact constituted the church, took the church records with them, and began worshipping at a house about three miles from Richmond belonging to one of them. The three members who had been dismissed by letter joined them, and from time to time since other members have been added, and the organization of the church under a pastor has been continuous at that place from time to time. The remainder of the congregation who sided with the pastor continued to worship in the church at Richmond and

continued their organization, the trustees of the church holding the title as before and remaining with them. Both sides called themselves the Particular or Predestinarian Baptist Church of Richmond, Ky. Things went along in this way until the year 1908, when the Richmond congregation sold the Richmond property to the Missionary Baptist Church with a view to erect a church of their own on another lot, and thereupon, on April 24, 1908, the church worshipping three miles from Richmond brought this suit against the Missionary Baptist Church claiming that it owned then one-half of the property. On final hearing in the circuit court its petition was dismissed, and it appeals.

It is earnestly insisted for the appellants that Elder Burnam and those who sided with him, although they remained in the church property, in fact departed from the faith as held by the Particular Baptist Church as described in the deed of Green Clay; that the clerk and the three members who went with him were faithful to the principles of the church; that the title by the Clay deed was vested in the church holding the principles referred to; that the majority, having abandoned these principles, are not the owners of the property, and that their exclusion of the minority cannot affect their rights in the property, if the minority were holding to the faith and the majority had departed from it. There is in the record much theological learning on this question, and we are referred to a number of legal authorities which are relied on to sustain the position of appellants that the facts being as shown by them, the law is in their favor. But we do not deem it necessary to go into this question. No one of appellants was a member of the church when the separation occurred in 1888. None

of the parties who then belonged to the church and went off from the remainder of the congregation are now living and members of the congregation. If the appellants are right now, the four members who went off in 1888 were entitled to the property. If appellants have any standing in court, it is as their successors, or as members of the congregation constituted by them, and therefore succeeding to their rights. That separation occurred 19 years before this suit was brought. A large number of the persons who were living at that time and took part in the transaction have been called to a higher sphere. The great lapse of time has necessarily obscured largely the facts that were then known to all. With the facts all before them and when all the parties were living, the four people who went off elected to set up no claim to the property. Their conduct for years was an abandonment of all claim to it. When they had abandoned claim to the property and permitted the other people to use it as their own for so many years, the court will not allow them to withdraw the election they then made, and assert a claim to the property after death has silenced the tongues of so many of the parties to the transaction. Equity will not enforce a stale claim. It will not aid those who sleep upon their rights. On the argument of the case before us it was said by appellant's counsel that the reason no suit was brought at the time for the possession of the property was that the four people who went off had contributed little to the building of the church and felt a delicacy in claiming property in which they had no real pecuniary interest. If this was true then, it should be equally true now. If the original four abandoned claim to the property because they felt that in good conscience they ought not to claim it,

appellees should not be disturbed by appellants who have come in since and after appellees have been permitted to hold and use the property for 19 years as their own. It is true limitation is not pleaded. But, although limitation is not pleaded, a court of equity will refuse to enforce a stale claim, especially where it is without merit in fact. In Badger v. Badger, 2 Wall. 94 (17 L. Ed. 836), the United States Supreme Court thus states the rule where there has been unreasonable delay in the assertion of a claim: "In such cases courts of equity, acting upon their own inherent doctrine of discouraging for the peace of society antiquated demands, refuse to interfere where there has been gross laches in prosecuting the claim or a long acquiescence in the assertion of adverse rights. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment caused by the fraud or concealment of the parties in possession, which will appeal to the conscience of the chancellor." We followed this rule in Gatewood v. Gatewood, 70 S. W. 284, 24 Ky. Law Rep. 931, and East Jellico Coal Company v. Hays, 117 S. W. 307, 133 Ky. 4, upon facts not as strong as those shown here.

Judgment affirmed.